CREIGHTON (HARGRAVE v.). See Case No. 6,064.

---

## Case No. 3,383.

### CREMER v. HIGGINSON et al.

[1 Mason, 323.] [2]

Circuit Court, D. Massachusetts. Oct. Term, 1817.

GUARANTY—DISCHARGE OF GUARANTOR—APPLICATION OF PAYMENT.

1. Upon a letter containing this clause, "the object of the present letter is to request you if convenient, to furnish them, (Messrs. Stephen

[1] [Case unreported.]

[2] [Reported by William P. Mason, Esq.]

and Henry Higginson,) with any sum they may want, as far as fifty thousand dollars; say fifty thousand dollars. They will reimburse you the amount, together with interest, as soon as arrangements can be made to do it; and as our embargo cannot be continued much longer, we apprehend there will be no difficulty in this. We shall hold ourselves answerable to you for the amount." *Held*, that this was not an absolute original undertaking, but a guaranty; that it covered advances only to Stephen and Henry Higginson, (who were then partners) on partnership account; and could not be applied to cover advances to either of the partners separately, on his separate account; that the authority of guaranty was revoked by a dissolution of the partnership, and no subsequent advances made by the party after a full notice of such dissolution were within the reach of the guaranty; that the letter did not import to be a continuing guaranty for money advanced toties quoties from time to time, to the amount of fifty thousand dollars, but for a single advance of money to that amount; and that when once advances were made to fifty thousand dollars, no subsequent advances were within the guaranty; although at the time of such farther advances, the sum actually advanced had been reduced below fifty thousand dollars, by reimbursements of the debtors.

[Cited in Whetmore v. Murdock, Case No. 17,510; National Bank v. Hall, 101 U. S. 51.]

2. When a debtor owing several debts, makes a payment to a creditor, the debtor has a right to apply it to what debt he pleases; if he makes no specific assignation, the creditor may apply it as he pleases; and where neither party appropriates it the law will apply it according to its own notion of the intrinsic justice and equity of the case.

3. Where money is advanced to a partnership under a guaranty, and the partnership is dissolved, and the debt is then carried, at the request of the debtors, to their separate accounts, according to their proportion of interest in the partnership; and the creditor gives the partners separately, a credit for such proportion, and discharges the partnership account, by carrying it to such separate account, and no notice is given thereof to the guarantor, the latter is discharged from all responsibility.

[Cited in Gelpcke v. Quentell, 74 N. Y. 601.]

4. If upon a letter of guaranty addressed to a particular person, advances are made upon the faith of the guaranty, it is the duty of the person so making the advances, to give notice thereof within a reasonable time to the guarantor, otherwise he will be discharged from all liability for such advances.

[Cited in Wildes v. Savage, Case No. 17,653; Bell v. Bruen, 1 How. (42 U. S.) 185.]

This was an action of assumpsit, brought by the plaintiff as surviving partner of Thomas Theodore Cremer of Rotterdam, who had carried on business there, under the firm of Thomas and Adrian Cremer, against Stephen Higginson and Samuel G. Perkins, surviving partners of George Higginson of Boston, who had transacted business in Boston, under the firm of Stephen Higginson and Co. upon a letter of guaranty, bearing date December 15, 1808, and given by Stephen Higginson and Co. to Stephen Higginson, Jr., and Henry Higginson, merchants of Boston; and at that time partners, under the firm of Stephen and Henry Higginson, and addressed to Messrs. T. and A. Cremer. The letter was admitted by the defendants to have been written by Stephen Higginson and

Co. and is as follows: "Boston, December 15th, 1808. Messrs. Thomas and Adrian Cremer, Rotterdam. Our friends and connexions, Messrs. Stephen and Henry Higginson, contemplate, under certain circumstances, making a considerable purchase of goods on the continent, and for that purpose are about to send an agent to Europe. They wished to obtain a letter of credit from us to increase their means, and to be used or not as circumstances may require. As we are now indebted to you, and have no funds on the continent of Europe, we told them we could not give a positive letter of credit for any sum, but that we had no doubt you would be disposed to furnish them with funds under our guarantee. The object of the present letter, is therefore to request you, if convenient, to furnish them with any sum they may want, as far as fifty thousand dollars; say fifty thousand dollars. They will reimburse you the amount they receive, together with interest, as soon as arrangements can be made to do it; and as our embargo cannot be continued much longer, we apprehend there will be no difficulty in this. We shall hold ourselves answerable to you for the amount, and are, with great regard, gentlemen, your friends and servants, Stephen Higginson and Co. Signature of S. V. S. Wilder."

It was proved in the cause that Mr. S. V. S. Wilder, the agent referred to in said letter of guaranty, shortly after the date of it, went to Europe, having a general letter of credit from Stephen and Henry Higginson; and on or about June 10, 1809, he forwarded the letter of guaranty to Messrs. T. and A. Cremer, who acknowledged the receipt of it, June 19, 1809, in letters written by them to Stephen Higginson and Co., Stephen and Henry Higginson, and to Mr. Wilder, in which they agreed to give to Stephen and Henry Higginson, the credit asked for under the guaranty. These letters were severally received by the respective parties, to whom they were addressed. The letter of guaranty was written during the existence of the embargo in the United States; but before it was received by Messrs. Cremer, the embargo was removed, and the commercial intercourse with Europe was restored, and large shipments of colonial produce were made to Holland. Among others, there was a large shipment of ashes made by Stephen and Henry Higginson, to T. and A. Cremer, and received by them before any use was made of the letter of guaranty by Mr. Wilder. On April 1st, 1809, Stephen and Henry Higginson dissolved their copartnership, of the intention to do which, they had previously given public notice in the newspapers in Boston, as early as May 8th, 1809, and at different times after that. After this period, on September 14, 1809, Mr. Wilder wrote from Paris to T. and A. Cremer, that he had caused insurance to be effected at Hamburg to the amount of 60,000 f. on goods ordered to

be shipped from Tonningen for account of Stephen and Henry Higginson, and asks Messrs. T. and A. Cremer to inform him, whether it will be most for the interest of Stephen and Henry Higginson, that they, T. and A. Cremer, should remit to Hamburg; or that the agent there, Mr. Thornton, should draw on them. This letter is answered September 19th, and T. and A. Cremer agree to accept drafts drawn on them to the amount requested, and desire Mr. Wilder to specify the names of the persons, for whose use the money is to be paid. The receipt of this letter is acknowledged by Mr. Wilder, September 25, 1809, in a letter of that date to T. and A. Cremer, and after agreeing that Thornton had better draw on them, he writes thus: "That a part of the goods are consigned to Messrs. Higginson and Dodge, New York; and a part to Messrs. Stephen and Henry Higginson, Boston, but in consequence of the dissolution of partnership of those firms, on or after the 1st of September present, you will please to consider the advances for account of Stephen Higginson, Jr., in whose name the business is hereafter to be conducted; and in charging him with these advances, you will of course pass to his credit, a sufficient amount of the proceeds from the sales of the ashes now at your disposition, for account of Messrs. Stephen and Henry Higginson, for your reimbursement." And on the 30th of the same month, before receiving an answer from T. and A. Cremer, he writes them again, saying he has authorized Messrs. Von der Leyen, of Crefeld, to draw on them for $1307.15 for charges on goods forwarded to Tonningen, for account of Messrs. Stephen and Henry Higginson, and Higginson and Dodge; and he says, "which draft you will please to duly honor, and charge the amount to account of Mr. Stephen Higginson, Jr., Boston, whom I shall advise accordingly." On September 29th, T. and A. Cremer answered Wilder's letter of September 25th; and after observing that they do not know Higginson and Dodge, they request Mr. Wilder to write a letter saying "that the insurance was for Stephen and Henry Higginson, and that you desire us to pay the same on their account by virtue of their letter of credit." This letter is answered by Wilder, October 14th, who says: "In conformity to your desire, when I receive Mr. Thornton's account, I will advise you to pay it for account of Messrs. Stephen and Henry Higginson, by virtue of a letter of credit in my favor from Messrs. Stephen Higginson and Co., dated Boston, December 16, 1808;" and by virtue of the same credit, and for account of Stephen and Henry Higginson, he requests them to honor Von der Leyen's draft as per letter of advice of 30th ult.; and these drafts Messrs. Cremer duly paid. On the 6th of September, 1809, Stephen Higginson, Jr., wrote to Messrs. Cremer, informing them of the dissolution of his copartnership with his brother Henry, who had established himself in London, and requests them to advance Mr. Wilder funds on his account, and states, that he has shipped on board the Golden Age, 79 bbls. ashes consigned to the supercargo, and then says, "who is ordered to remit the proceeds to your orders for account of the late firm of Stephen and Henry Higginson, presuming that a balance may yet be due to you; if not, please to hold it to order of Henry Higginson, London." And on November 1st, 1809, Stephen Higginson, Jr., writes again to T. and A. Cremer, and requests them to advance Mr. Wilder funds to the amount of $100,000, and points out certain modes of reimbursement. Early in September, 1809, Henry Higginson established himself as a commission merchant in London, and T. and A. Cremer, in a letter to him, of October 4th, 1809, acknowledge the receipt of a letter from him of September 8, 1809; which letter they did not produce, in which they say: "We received your favor of September 8th, and circular letter. We congratulate you on the new establishment, not doubting, but an entire success will attend it; to which we shall be happy to contribute as much as lies in our power." On the 16th of December, 1809, T. and A. Cremer acknowledge the receipt of Stephen Higginson, Jr.'s letter of September 6th, and say, "We shall advance funds on your account to Mr. Wilder, when he requires it;" and then say they have already advanced him some sums; and also, "We accepted Mr. Wilder's draft for 6318.1 f. at thirty days' date on the 8th inst., for which we shall debit you on the 7th January next." On the 6th of January, 1810, T. and A. Cremer wrote to Henry Higginson, saying, they had received Stephen Higginson, Jr.'s letter of November 1st, in which he requests the advance to Mr. Wilder of $100,000; and they tell him they have no objection to grant it, not doubting that he will guaranty the same; and on the 8th January, 1810, they write Stephen Higginson, Jr., acknowledging the receipt of his letter of November 1st; and say they have no objection to granting the credit, but as their object in making advances is to have shipments made them for the same; and as the bare interest is a poor compensation for advances made for an unlimited time, and as there is little probability, that he will be able to reimburse them by shipments, they must leave it to his equity to make them such a compensation as will be due them; and as Wilder then wanted the funds, they would go on to furnish them; and on the same day, they also wrote Stephen Higginson and Co. saying: "We had letters from Mr. Stephen Higginson, Jr., requesting us to extend the credit to Mr. Wilder unto $100,000. We have made no difficulty to grant this, not doubting but you will also approve of it, and warrant us the same, the credit opened by you in favor of Stephen and Henry Higginson, being only of $50,000." This letter did not reach Messrs. Stephen Higginson and Co. until the

month of June following, and was not answered by them. The letter of January 6, 1810, to Henry Higginson not being answered, T. and A. Cremer wrote again to him on February 12, 1810, stating, that the credit was so large, which Stephen Higginson Jr. wished them to open with Mr. Wilder for his account, that they must insist on having his (Henry Higginson's) guaranty for the same; and on March 3, 1810, Henry Higginson in answer, agrees to become responsible to them. Previous to this period, on the 10th of October, 1809, Henry Higginson opened a credit with T. and A. Cremer, in favor of Mr. Wilder for 50,000 f., which was independent of the other credits. Between the 4th of October, 1809, and the 25th of August, 1810, Mr. Wilder drew, and authorized drafts to be drawn, on T. and A. Cremer for various sums of money, and T. and A. Cremer also, during that period, remitted to Mr. Wilder various bills of exchange; the whole of which sums so drawn and remitted, amounted to 242,092.7 f., equal to $96,836.94; and prior to and during said period, T. and A. Cremer received remittances from Stephen Higginson, Jr., to the amount of 152,927 f., equal to $61,170.80, but no direction was specifically given by Stephen Higginson, Jr., in what manner said remittances should be credited. Of the sums composing the 242,092.7 f., 67,175.13.8 f. in different sums, was stated in the correspondence to be advanced under the guaranty of Stephen Higginson and Co.; 44,361.14.8 f., in different sums, were stated to be under Henry Higginson's guaranty of 50,000 f. and 130,554.19 f., in different sums, was advanced without any guaranty being specified. Again, of this sum of 242,092.7 f. two sums advanced in October, 1809, amounting to 19,426.18 f., were stated to be for account of Stephen and Henry Higginson; 8,910.6 f. was advanced without any mention on whose account; and all the residue was specifically stated to be for account of Stephen Higginson, Jr.

On an exhibit of sundry extracts from the books of T. and A. Cremer, it appeared also, that two entries, in the year 1809, were made to the debit of Stephen and Henry Higginson; but these charges, at the close of the year, were carried to the debit of Stephen Higginson, Jr., and all the subsequent advances were charged to the account of Stephen Higginson, Jr. Although the names of Stephen and Henry Higginson, in that connexion, never appeared in the ledger of T. and A. Cremer, yet, in an account current book kept by them, they stated an account current with Stephen and Henry Higginson; charged them with the several advances made as aforementioned in the year 1809, and carried the balance of that account at foot to the debit of Stephen and Henry Higginson; and in July or August, 1810, they remitted an account current with Stephen and Henry Higginson for the year 1809, to Henry Higginson in London. On receiving it, Henry Higginson wrote them word, that his partnership with Stephen Higginson, Jr., had been dissolved a twelvemonth, and that certain charges (which he enumerated) in the account, ought to be carried to the separate account of Stephen Higginson, Jr.; and certain charges, amounting to upwards of $10,000, to his separate account; and that this would make no difference to T. and A. Cremer, as he and his brother were mutually responsible for each other's engagements. On receiving this letter, Messrs. T. and A. Cremer, in the month of September, 1810, made out new accounts current, charging Stephen Higginson, Jr., with the items specified by Henry Higginson, and debiting Henry Higginson, with the other items. The balance thus due from Henry Higginson was paid by him at the end of the year 1810; and he, at different times, authorized T. and A. Cremer to draw on him for moneys due them from Stephen Higginson, Jr., but they did not. From this period Henry Higginson continued in perfect credit, and doing a large business until the last of October, 1811, when he stopped payment, and was, at that time, indebted in a small sum to T. and A. Cremer, which debt they afterwards proved under the commission of bankruptcy against him, and received their dividends. Early in the year 1812, Stephen Higginson, Jr., stopped payment, and in May, 1812, T. and A. Cremer, who did not appear to be informed of it, though they expressed great fears, that it would happen, by letter informed Col. T. H. Perkins, who was then in Europe, that they had made great advances to Mr. Stephen Higginson, Jr., and wished him to aid them in obtaining security, but requested him to keep this communication an entire secret from Stephen Higginson & Co. It was also proved, that an active correspondence was carried on between T. and A. Cremer and Stephen Higginson & Co. during the years 1809, 1810, 1811, in which upwards of forty letters were written by the former to the latter. Yet they never gave any notice to Stephen Higginson & Co., either that they were making, or afterwards that they had made, advances to Stephen and Henry Higginson or to Stephen Higginson, Jr., nor did they give them any notice on the subject, till the close of the year 1813, long after the parties had become insolvent.

This case turned principally on the facts introduced in evidence, and was argued at great length to the jury. The questions of law, that arose, related to the construction to be put upon the letter of guaranty; the effect of the dissolution of copartnership between Stephen Higginson, Jr., and Henry Higginson; and the necessity of proving a notice to the defendants of the advances made by the plaintiffs.

On these points, Hubbard & Prescott, for defendants, contended: (1) That the guar-

anty of the defendants was a conditional one. That guaranties were to be construed and explained according to the true intent and meaning of the parties; which intention could only be collected from a consideration of the object, to which the guaranty related, and the circumstances under which it was given. That this guaranty was clearly limited, as to its object, amount, and duration. That its object was to enable Stephen and Henry Higginson to raise funds on the continent during the embargo then existing in this country, which prevented them from shipping goods there for that purpose. That the amount specified was the sum of $50,000, and the means and mode of payment pointed out plainly indicated the intention of the guarantors, that it should not be considered a continuing guaranty, but applicable only to the first $50,000 advanced. And that it ought to be construed, as limited in its duration, to the continuance of those peculiar, circumstances, under which it originated. (2) That it was given for advances to be made to the firm of Stephen and Henry Higginson only; and, therefore, no advances made to either of those individuals after the dissolution of their copartnership, could be covered by it. (3) That it was the duty of the plaintiffs to give notice to the defendants, within a reasonable time, of the advances they had made under the guaranty; and that their neglecting to do this discharged the defendants from all responsibility.

Blake & Webster, for plaintiffs, assented to the rules adopted by the defendant's counsel, for construing the guaranty; but as to the inferences to be drawn from them, they differed widely. They contended: (1) That the situation of the parties, and the commercial objects of Stephen and Henry Higginson totally disproved the argument, that this was a conditional guaranty, and limited to the continuance of the embargo. That nothing expressed in the guaranty itself supported such a construction, and it could not be taken up upon conjecture merely. (2) That from the express terms of the guaranty, and the extensive commercial operations contemplated by Stephen and Henry Higginson at the time it was given, it was evidently intended to be a continuing guaranty. That Wilder, the agent of Stephen and Henry Higginson, was sent on to the continent for the express purpose of increasing their means, and was to act according to circumstances, and at his own discretion. It was important that an extensive credit should be obtained there; and the guaranty must have contemplated a course of dealings, and not a single transaction. That under such circumstances it could not have been the intention of the parties to cover the first $50,000 only, that were advanced, when the advances were, from time to time, to be paid off by remittances; but to cover the $50,000, in which

Stephen and Henry Higginson should be indebted to the plaintiffs at one time, and upon a balance of their accounts. That the defendants would themselves have loaned Stephen and Henry Higginson $50,000, if they could have readily commanded such a sum at the time it was wanted, but not being able to do so, they were willing to give their guaranty for that amount to any other person, who would advance it. That the greatest restriction, therefore, that could possibly be put upon the terms of this guaranty was, that after a debt had been run up to the full amount of $50,000 all payments made on the general account should be applied to its discharge. In other words, that, if Wilder could open a negotiation with the plaintiffs, and obtain from them advances for the purpose of carrying on the contemplated speculations on the continent, the defendants would be answerable for such advances to the extent of $50,000. Mason v. Pritchard, 2 Camp. 436, 12 East, 227; Merle v. Wells, 2 Camp. 413; Bastow v. Bennett, 3 Camp. 220; Sturgis v. Robbins, 7 Mass. 301.

STORY, Circuit Justice (after stating the facts). There are several questions of law in this case, upon which it is now my duty to instruct you.

The first point is, what is the true construction of the letters of the defendants to the plaintiffs, of the 15th of December, 1808, which is the main hinge of the whole of this controversy? I am clearly of opinion, that, in point of law, it is not an absolute undertaking for the payment, in the first instance, of all advances made to Stephen and Henry Higginson, not exceeding 50,000 dollars. It is in fact an original collateral undertaking to guaranty the payment of such advances; and consequently the debt is properly the debt of Stephen and Henry Higginson, and the defendants are liable only upon their default, and to the extent of the guaranty. It has been asserted, that the guaranty is conditional, having reference to the then state of our commerce; and that the embargo being removed, the implied condition, upon which the advances were to be made, viz. the impracticability of Stephen and Henry Higginson's remitting funds to Europe, was completely done away before any advances were made; and that the defendants are, therefore, absolved from all responsibility. There is nothing in this argument. The letter contains no such implied condition; and it would be extremely dangerous for courts of law to indulge themselves in searching after such hidden and conjectural meanings in such an instrument. It is sufficient for us, that the language of the letter speaks not in such ambiguous or hypothetical terms. As little ground is there for the argument, that the plaintiffs were, by the terms of the letter, bound to look to the application of the funds, advanced by them to the agent of Messrs. Stephen and Henry Higginson, under

the guaranty. The plaintiffs were not bound to see, whether the agent properly applied the advances or not; or whether he purchased with them French goods, or any other goods. He was to act solely under the instructions of his principals, with which the plaintiffs had nothing to do; and the defendants are liable for all advances, bona fide made under the guaranty, even though the agent may have applied them contrary to the instructions of his principals.

Having thus fixed the interpretation of the letter on this point, that it is a mere guaranty of the debt of third persons, the next question upon its construction is, to whom are the advances to be made. If there be any thing clear in this cause, it is, that the advances are to be made to Stephen Higginson, Jr., and Henry Higginson, then copartners in trade under the firm of S. & H. Higginson. It follows, therefore, that it covers only advances made to them jointly on their joint credit, and not advances made to them severally upon their several credit. Unless then it shall be completely established, that the advances were made on the joint account of the firm, there is an end of the plaintiffs' case.

Another question, upon the construction of this letter is, whether it contains a limited or a continuing guaranty; in other words, whether it be a guaranty for advances made to the amount of 50,000 dollars, and when that sum is once advanced, it is exhausted; or, whether it covers any further advances, made from time to time, after the 50,000 dollars have been once advanced, provided, at the time of such advances, the balance then due to the plaintiffs, does not, with such advances, equal the stipulated sum of 50,000 dollars. Upon examining the terms of this letter I am of opinion, that it is a guaranty limited to a single advance of 50,000 dollars; and that when once this sum is advanced, the guarantors are no longer liable for any future advances, whatever may be the state of the accounts between the parties. The language of a letter should be very strong, that would justify a court in holding the guaranty to be a continuing guaranty, which is to cover advances, from time to time, to the stipulated amount, toties quoties, until the guarantor shall give notice to the contrary. I see nothing in this letter to justify such a conclusion; and in every doubtful case, I think, that the presumption ought to be against it. If, therefore, in the present case the advances to Stephen and Henry Higginson ever equalled 50,000 dollars, all subsequent advances, although the debt of Stephen and Henry Higginson may have been, at the time, diminished by payments, so as to be far within that sum, are beyond the reach of the guaranty.

The next point in the cause, is, as to the effect of the dissolution of the partnership of Stephen and Henry Higginson. From the moment that dissolution was made known to the plaintiffs, all right to make future advances upon the credit of the firm was completely done away. To be sure, the plaintiffs, by agreeing to make the stipulated advance of 50,000 dollars, and specifying that in writing to Mr. Wilder, and agreeing to accept his bills to that amount, might have rendered themselves liable to pay to a third person, who should take the bills upon the credit of that written agreement, to the full amount. And in relation to contracts actually made by Mr. Wilder upon the footing of that agreement, and advances made, or agreed to be made by the plaintiffs to satisfy such contracts, before notice of the dissolution, the plaintiffs would be entitled to hold the defendants liable under the guaranty, if the contracts were made with third persons upon the faith and credit of the plaintiffs' acceptance. But as to all other future advances, notice of the dissolution of the partnership was a complete revocation of all authority to make such advances, at least so far as respects the defendants. The dissolution was publicly announced in May, 1809, in the newspapers in Boston, to take place on the first day of September of the same year. The defendants had due notice of such dissolution, and had a right to consider, that all advances made by the plaintiffs, after a knowledge of such dissolution, were advances made on the credit of the partners severally, and not on the partnership account, or on the credit of the guaranty of the defendants. And even if there was a secret understanding between Stephen Higginson, Jr., and Henry Higginson, after such dissolution, that the shipments made by Mr. Wilder, and the advances made by the plaintiffs for the payment thereof, should be considered as made for their joint interest, in the same manner as if the partnership were not dissolved, and the plaintiffs upon the supposition of such joint interest actually made such advances, still if this was unknown to the defendants, and they never had notice of such understanding, they are not bound by their guaranty for the payment of such advances.

As to the manner in which the payments and remittances, made by Stephen and Henry Higginson, or by Stephen Higginson, Jr., to the plaintiffs are to be applied, the law is perfectly clear. Where a debtor owing several debts, makes any payment to a creditor, he has a right to apply it to what debt he pleases. If he makes no specific appropriation, the creditor may apply it as he pleases. And where neither party appropriates it, the law will apply it according to its own notion of the intrinsic equity and justice of the case. In the present case, the plaintiffs had a guaranty of the defendants for the advances to the amount of 50,000 dollars, and a guaranty of Henry Higginson for advances to the amount of 50,000 florins; and they further agreed, at least as early as the 8th of January, 1809, to give to Stephen Higginson, Jr., on his own account an additional credit

of 50,000 dollars. Now, where a creditor holds several funds, or, what is the same thing, has agreed to advance money upon the footing of several distinct credits, he is bound to state at the time of the advance, upon which credit it is actually made. At least, if he does designate in his books or correspondence the particular credit, upon which particular advances are made, he is not at liberty to change the credit afterwards upon any new occurrence, which may materially affect the rights of third persons.

In the present case, the plaintiff has charged certain advances, as made on the credit of the guaranty of the defendants, and others, as on the guaranty of Henry Higginson; and others are without any specific statement of any guaranty, on which they were made. As to the two former advances the plaintiffs are bound by their original charges, and cannot now transfer them from the one guaranty to another. And as to the last, they must be deemed, under the peculiar circumstances of this case, to have been made on the several credit of Stephen Higginson, Jr., to whom they are charged.

There is another point in this cause, which, if it were alone, would, in my judgment, be conclusive against the plaintiffs. Assuming that all the advances of the plaintiffs were actually made upon the credit of the partnership of Stephen and Henry Higginson; yet it appears, that in August, 1810, the plaintiffs, at the request of Henry Higginson, and with the implied assent of Stephen Higginson, Jr., and upon a statement, that the partnership had been dissolved for a whole year before that time, did actually transfer the partnership balance, then due, in certain proportions, to the several and separate accounts of Stephen Higginson, Jr., and Henry Higginson, and gave credit to them severally for their respective shares of such balance, until after they both became insolvent (more than three years afterwards) without the facts having been in any way communicated to the defendants. In my judgment, this giving a new and unlimited credit to them severally, upon their several accounts, for that balance, without any communication with, or assent by the defendants, was a complete discharge of the defendants from their original guaranty. It was in the highest degree injurious to them, and must be considered, so far as respects the defendants, as an agreement by the plaintiffs to hold that balance upon the sole credit of the partners themselves in the proportions with which they were charged in their separate accounts. If a creditor will undertake to give a new credit to his debtor, and thereby materially to change the situation of a surety, and a fortiori of a guarantor, the latter is absolved from all responsibility, unless he has notice of, and becomes party to, the new transactions.

The last point of law, which it is necessary to consider, is, whether any notice was necessary to have been given of the amount of the advances made by the plaintiffs to the defendants. It appears that the plaintiffs did inform the defendants of their readiness to make the stipulated advance of $50,000, as soon after their receipt of the letter of guaranty as was practicable; so that the point is narrowed to the consideration of the question, whether notice was necessary of the amount of the advances, after they were actually made. And I am most distinctly of opinion, that it was the duty of the plaintiffs, within a reasonable time after the advances were actually made, to give notice thereof to the defendants, and that reliance was placed upon their guaranty to insure the repayment. And if notice was not given in a reasonable time, nor until after a material change in the circumstances of the debtors, such laches of the plaintiffs was a complete discharge of the defendants from their guaranty. The first notice given to the defendants of any advances in the present case, was not until near the close of the year 1813, more than three years after all the advances were made, and when both of the debtors had become insolvent. During this period an active correspondence was kept up between the plaintiffs and the defendants, nearly fifty letters having passed between them, in which not one syllable is to be found relative to any advances to Stephen and Henry Higginson, or either of them. Nor is this extraordinary silence imputable to any accident or mistake. It appears from a letter of the plaintiffs to Col. Perkins (a witness in the case) that it was studied and intentional. Under these circumstances I am bound to declare, that the law holds the plaintiffs guilty of such laches, as discharges the defendants from all liability for the advances actually made. Verdict for the defendants.