16 U.S. 48 (____)
3 Wheat. 48
LANUSSE
v.
BARKER.
Supreme Court of United States.

*65 February 9th. Pendleton, for the plaintiff.
The Attorney-General and Jones, contrà.
*67 February 17th, 1818. JOHNSON, Justice, delivered the opinion of the court.
This case comes up on a bill of exceptions. This charge of the judge was given pro formâ, generally, against the plaintiff, and the verdict conforms to it. There are many counts in the declaration, and if on any one of those counts, the plaintiff was entitled to recover, the judgment below must be reversed.
*The first count is on a refusal to pay two sets of bills, drawn on [*143 Taber & Son, of Portland, payable in New York. These bills were duly protested and returned, and the amount, with damages, refunded by the plaintiff. In defence to this count, it is contended: that the undertaking of Barker, as expressed in his letter of the 9th of January 1806, relates to a different transaction from that upon which this cotton was purchased; that this transaction originated in the letters of the 26th of January, or 24th of July 1806, or of the 20th February 1807, and in neither of those letters is the undertaking, on bills to be drawn on Taber & Son, reiterated: that the letters alluded to contain, in fact, an implied revocation of the undertaking in the letter of the 9th, of which the plaintiff was bound to take notice.
To the correctness of these positions, this court cannot yield its assent. Nothing could be more inconsistent with that candor and good faith which ought to mark the transactions of mercantile men, than to favor the revocation of an explicit contract, on the construction of a correspondence nowhere avowing that object. It was in the defendant's power to have revoked his assumption, contained in the letter of the 9th, at any time prior to its execution, but it was incumbent on him to have done so, avowedly, and in language that could not be charged with equivocation. In this case, we discover nothing from which such an intention can fairly be inferred. The whole correspondence refers to the same subject, and has in view the same object. The expediting of the ship *Mac on freight, if freight could be obtained, [*144 and if not, to be filled up (at least, to the quantity of cotton here purchased), on owners' account. This agency the plaintiff undertakes, expressly on the credit of Barker, for a house, with whose credit, except on his introduction, he is unacquainted; and so far from restricting the order contained in the letter of the 9th, there is not one from the defendant, in the subsequent correspondence, that does not enlarge the order as to quantity, upon the contingency of the ship not getting freight.
But it is contended, although the original assumption may not have been revoked, it was not complied with, according to the terms in which it was expressed, and therefore, was not binding to the defendant. And on this ground, so far as relates to the bills in this count, the court is of opinion, that the defence is supported on legal principles. The assumption is to guaranty bills, "drawn on Taber & Son, Portland, or me, at 60 days sight." These bills are drawn on Taber and Son, Portland, payable in New York. Now, although we cannot see why an honorable discharge of his contract did not prompt the defendant to accept these bills for the *68 honor of the drawer, when they were returned to New York for non-acceptance, yet as it is our duty to construe the contracts of individuals, and not to make them, we are of opinion, that these bills were not drawn in conformity to the assumption of the defendant. Merchants well understand the difference between drawing bills upon a specified place, and drawing them upon one place, payable in another. We are not to inquire into the *145] *reasons which govern them in forming such contracts, or competent to judge, whether any other mode of complying with a contract may not be as convenient to them, as that which they have consented to be governed by. But it will be perceived, that this opinion can only affect the right of the plaintiff to recover the damages paid by him on the return of those bills, and has no effect in this view of the case, upon the plaintiff's right to recover upon the original guarantee of this debt; when legally demanded.
It is, however, contended, that the election to draw in this form, was conclusive upon the plaintiff, and he could not afterwards resort to a draft upon the defendant himself. And this brings up the question upon the plaintiff's right to recover upon the second count. This count is on a refusal to pay a bill drawn on Barker himself, for the exact balance of the invoice of the cotton, after crediting the defendant with the bills that he had paid. This bill was not negotiated and returned, but drawn in favor of an agent of the plaintiff, and of course, no damages are demanded on it. The defence set up to this count, to wit, that the plaintiff, by making his election to draw upon Taber & Son, is thereby precluded from resorting to Barker, we think, cannot be sustained. It is in vain that we look for any passage in the correspondence, that holds out this idea, nor is there anything in the nature of the transaction, that will sanction this court in attaching such a restriction to Barker's undertaking. It was, in effect, a promise to furnish the funds necessary to carry into execution this adventure. *146] *Had it contained a mere guarantee of bills to be drawn on Taber & Son, there might have been some ground for this argument; but where the defendant confers the right to draw upon himself, and, in fact, clearly recommends a preference to such bills, he makes himself the paymaster, and we consider it an original substantive undertaking. In this view of the case, the law quoted on the subject of securityship undertakings cannot be applicable, and we think the plaintiff ought to recover on this count.
There are other items in the plaintiff's demand, on which, as the case will be sent back, it is necessary to express an opinion. The first is the charge of about $1200 for services and expenses incident to this agency; the other is the charge of interest. The first of these items we are clearly of opinion the plaintiff is entitled to, and that it is recoverable, under the counts for services performed, and money expended in the discharge of this undertaking. And as to the second, we are equally satisfied, that interest is recoverable under the second count, in nature of damages.
But some difficulty has arisen on the question, whether the plaintiff is entitled to recover the interest of New Orleans, or of New York. The former the bill of exceptions states to be ten per cent.; the latter, seven per cent. Where a general authority is given to draw bills from a certain place, on account of advances there made, the undertaking is to replace the money at that place. Had this bill on Barker been negotiated, and returned, under *69 protest, the holder would have been entitled to demand of the drawer the interest of *New Orleans, and thus, incidentally, at least, the defendant [*147 would have been compelled to pay the plaintiff that interest. But it may be contended, that as the letter of the 26th appears to restrict the order for this purchase, so as to make it depend on the condition of the practicability of negotiating bills on New York, the undertaking of Barker was limited to payments to be made in New York. On this point, the court are of opinion, that, even though we attach this condition to Barker's undertaking, the liability to replace the money at New Orleans still continued; and any necessary loss on the bills, on account of the difference of exchange, would have been chargeable to the defendant; but we think, further, that the restrictive words in the letter alluded to, may justly be considered as enlarged into a general order, in his subsequent correspondence. The court is, therefore, of opinion, that as the money was advanced at New Orleans, and to be replaced at New Orleans, the plaintiff may claim the legal interest at that place.
This court is of opinion, that there is error in the judgment below, and that it must be reversed. But this court can do no more than order a venire facias de novo.
An attempt has been made to obtain from this court a mandate to the circuit court, to enter a judgment in conformity to an agreement of parties entered on the transcript, which states the amount to be adjudged to the plaintiff upon several alternatives. But we are of opinion, that this court can take no notice of that consent; the verdict presents no alternative; *and the consent entered on the transcript, or on the minutes of the [*148 circuit court, forms no part of the record brought up by this writ of error. Nor will this court be led into the exercise of a power so nearly approaching the province of a jury in assessing damages.
Judgment reversed.[(a)]
*70 
*71 
*72 
*73 
*74 
NOTES
[(a)] Although contracts of guaranty are very familiar in the practice of the commercial world, comparatively few cases have been subjected to judicial decision in the English and American tribunals. It may not, however, be without use to the learned reader, to collect the principal adjudications on this subject, especially, as no attempt has yet been made to bring them before the public in a connected view.

Contracts of guaranty, like all commercial contracts, have received a liberal interpretation, in furtherance of the intention of the parties. But at the same time, they are not extended beyond the obvious import of the terms in their reasonable interpretation. Where, in a letter of introduction of a mercantile firm, the defendants used the following terms  "We do ourselves the pleasure of introducing them to your correspondence, as a house on whose integrity and punctuality, the utmost dependence may be placed; they will write you the nature of their intentions, and you may be assured of their complying fully with any contract or engagements they may enter into with you," it was held, that the letter did not import a guarantee of such engagements; and that parol evidence was not admissible, to explain the terms so as to affect their import, with regard to the supposed guaranty. Russell v. Clarke, 3 Dall. 415; s.c. 7 Cranch 69. So, where B. wrote to C., "as I understand Messrs. A. & Co. have given you an order for rigging, &c., which will amount to 4000l. I can assure you, from what I know of A.'s honor and probity, you will be perfectly safe in crediting them to that amount; indeed, I have no *objection to guaranty you against any loss, from [*149 giving them this credit;" it was held, that the writing did not import a perfect and conclusive guarantee, but only a proposition or overture tending to a guarantee; and that to make it a guarantee, B. ought to have had notice, that it was so regarded, and meant to be accepted, or there should have been a subsequent consent on his part, to convert it into a conclusive guarantee. McIver v. Richardson, 1 M. & S. 557. But it is said, that the words are to be taken as strongly against the party giving the guarantee, as the sense of them will admit of. Therefore, where the defendant wrote to the plaintiff, "I hereby promise to be responsible to T.M. (the plaintiff) for any goods he hath or may supply my brother W.P. to the amount of 100l.," it was held, that this was a standing or continuing guarantee to the extent of 100l., which might at any time become due, for goods supplied, until the credit was recalled. At the time the letter was written, goods had been supplied, to the amount of 66l., and afterwards, another parcel was delivered, amounting, together with the former, to 124l., all which had been paid for, and the sum now in dispute (and which by the judgment of the court, the plaintiff recovered), was for a further supply to W.P. Mason v. Pritchard, 2 Camp. 436; s.c. 12 East 227. So, where the defendant wrote to the plaintiff. "I have been applied to by my brother, W.W., to be bound to you for any debts he may contract, not to exceed 100l. (with you), for goods necessary in his business as a jeweller; I have wrote to say, by this declaration, I consider myself bound to you for any debt he may contract for his business as a jeweller, not exceeding 100l., after this date;" Lord ELLENBOROUGH said, that the defendant was answerable for any debt not exceeding 100l., which W.W. might, from time to time, contract with the plaintiff, in the way of business; that the guarantee was not confined to one instance, but applied to debts successively renewed; and that if a party meant to be a surety only for a single dealing, he should say so. Merle v. Wells, 2 Camp. 413. So, where the defendant wrote, *150] "I hereby undertake and engage to be answerable to the extent of *300l. for any tallow or soap supplied by Mr. B. (the plaintiff) to F. & B., provided they shall neglect to pay in due time;" Lord ELLENBOROUGH held it to be a continuing guarantee, while the parties continued to deal on the footing established when it was given; but that goods supplied, after new arrangements were made, were not within the scope of the guarantee; and he relied on the word "any," without which, he thought it might, perhaps, be confined to one dealing to the amount of 300l. Baston v. Bennett, 3 Camp. 220. But in debt on a bond entered into by A. and B. with the plaintiffs, reciting, that it was to enable A. to carry on his trade, and conditioned for the payment of all such sum or sums of money, not exceeding 3000l., with lawful interest, which should or might, at any time or times thereafter, be advanced and lent by the plaintiffs to A., or paid to his use, by his order and direction," it was held, that it was a guarantee for the definite amount of 3000l., and when an advance was made to that amount, the guarantee became functus officio, and was not a continuing guarantee. Kirby v. Duke of Marlborough, 2 M. & S. 18. And, where the defendants wrote to the plaintiff, "If W. & B., our sons, wish to take goods of you, on credit, we are willing to lend our names as security for any amount they may wish," the court held, that it was not a continuing guarantee, but was confined to the first parcel of goods sold to W. & B.; that it gave an unlimited credit as to amount, but was silent as to the continuance of the credit to future sales, and expressio unius, est exclusio alterius. Rogers v. Warner, 8 Johns. 119. And in a very recent case, where the defendants wrote to the plaintiff, "our friends and connections, S. & H.H., contemplate, under certain circumstances, making a considerable purchase of goods on the continent, and for that purpose, are about to send an agent to Europe; they wished a letter of credit from us, to increase their means and to be used or not as circumstances may require; as we are now indebted to you, and have no funds on the continent of Europe, we told them, we could not give *151] a positive letter of credit for any sum, but that we had no doubt, you would *be disposed to furnish them with funds under our guarantee; the object of the present letter is, therefore, to request you, if convenient, to furnish them with any sum they may want, as far as $50,000, say, 50,000 dollars; they will reimburse you the amount they receive, together with interest, as soon as arrangements can be made to do it; we shall hold ourselves answerable to you for the amount;" it was held, that this was a guarantee for a single advance to the amount of $50,000, and not a continuing guarantee, toties quoties, to that amount, and that as soon as $50,000 were once advanced, the guarantee ceased to operate upon future advances, although by intermediate payments, the sum due at the time of such new advances, was below $50,000. Cremer v. Higginson, 1 Mason 323.[1] Where A. requested B. to give C. any assistance in the purchase of goods, by letter, or otherwise, adding, "you may consider me accountable with him to you, for any contract he may make; it was held, that A. was to be considered as a guarantor, and not a joint-debtor, and that a contract by C. with B. to pay him a premium for guarantying a contract of C. with a third person was within A.'s promise. Meade v. McDowell, 5 Binn. 195.
A guarantee to the plaintiffs, "that if they will credit D. a sum not exceeding $500, in case he shall not pay it in twelve months, the guarantor will pay it," does not imply a condition that the plaintiff may not advance more than $500, if the additional advance be on the general credit of D. Sturges v. Robins, 7 Mass. 301.
A guarantee, "we, jointly and severally, promise to guarantee a payment of 500l. at five per cent. say, by a bill drawn on G.H., by D. & F. for 500l., dated 10th of January 1808," is to be construed as a general guarantee of the bill, not (as usual) a guarantee that the acceptor should pay, but a contract that either the drawer or the acceptor should pay. Philips v. Astling, 2 Taunt. 206. But upon such a guarantee (if it is to be construed as limiting the bill to the specific sum of 500l.), the guarantor would not be liable to the extent even of the 500l., if the bill be drawn *for a larger sum; [*152 for the terms of the contract must be strictly complied with. Ibid. And a guarantee to A., for goods to be sold by him, on credit, to B., will not inure to the benefit of a third person, who shall actually furnish the goods to B., although at the request of A., for a surety is not to be held beyond the scope of his own engagement. Robbins v. Bingham, 4 Johns. 476; Walsh v. Bailie, 10 Ibid. 180. And see 1 M. & S. 557. So, if a letter of credit be addressed to A., and part of the goods are delivered by A., and part by C. & D., the latter cannot recover on the guarantee. Robbins v. Bingham, 4 Johns. 476. So, a letter of guaranty, addressed to J. & A.N., by mistake, for J. & J.N., will not cover advances made by the latter, on the faith of the letter. Grant v. Naylor, 4 Cranch 224.
Many cases analogous to this have been decided. As, where A. became surety, by bond, that B should truly account to C. for all sums of money received by B., for C.'s use, and afterwards, B. took a partner, with C.'s knowledge, it was ruled, that the guarantee did not extend to sums received by B. and his partner, for C.'s use, after the formation of the partnership. Bellairs v. Elsworth, 3 Camp. 53. So, a bond conditioned to repay all sums advanced by five persons, or any of them, was held not to extend to sums advanced, after the decease of one of them, by the four survivors, the four then acting as bankers. Weston v. Barton, 4 Taunt. 674. And to the same effect will be found the following cases: Arlington v. Merritt, 2 Saund. 44; Wrightly v. Russell, 2 W. Bl. 934; s.c. 3 Wils. 539; Barker v. Parker, 1 T.R. 287; Myers v. Edge, 7 Ibid. 254; Strange v. Lee, 3 East 484. But if a bond be given to trustees, conditioned for the faithful service of a person, during his continuance in the service of a fluctuating or successive body of persons, not incorporated, as the Globe Insurance Company, it will extend to the whole time the party is in the service of such company, although the members may be continually changing. Metcalf v. Bruin, 12 East 400. An agent, in England, for merchants, the vendors of goods, in Russia, who guaranties "that the shipment shall be in conformity with the revenue laws of Great Britain, so that no impediment *shall arise upon the importation thereof, or that, in default, the consequence [*153 shall rest with the sellers," makes himself personally responsible to the vendee. Readhead v. Cator, 1 Stark. 14. An impediment arising from non-compliance with the navigation act, is an impediment within the terms of the guarantee. And such a guarantee is not within the statute of frauds, if the terms of the agreement can be collected from the written correspondence between the parties. Ibid. A. engages to guaranty the amount of goods supplied by B. to C., provided 18 months credit be given; if B. give credit for 12 months only, he is not entitled, at the expiration of six months more, to call upon A. on his guarantee. But B. having, after the commencement of the action, delivered an invoice, from which it appeared that credit was given for 12 months only, is at liberty to show that this was a mistake, and that, in fact, 18 months credit was given. Bacon v. Chesney, 1 Stark. 192.
In cases of guaranty, it has been made a question, whether the notice ought to be given to the guarantor of the advances made, and of the non-payment by the debtor. In Oxley v. Young, 2 H. Bl. 613, where the defendant, upon an undertaking of D. to indemnify him, guarantied to the plaintiff, an order sent to him by A. for certain goods, and the plaintiff informed the defendant, that the goods were preparing, but did not give him notice of the actual shipment, the court thought that the right to sue on the guarantee attached, when the order was put in a train for execution, subject to its being actually executed; and that the notice of such intended execution was sufficient; and the court further thought, that that right could not be divested, even by a wilful neglect of the plaintiff, though, perhaps, he might be liable to an action on the case, at the suit of the defendant, if any such neglect could be shown, contrary to all good faith, and by which a loss had been incurred. In Peel v. Tatlock, 1 Bos. & Pul. 419, Chief Justice EYRE appears to have been of opinion, that at least, in guarantees for good behavior, notice of any embezzlement or fraud ought to be given, within a reasonable *154] time; but the case finally went off upon narrower grounds. In *Russell v. Clarke, 7 Cranch 69, 92, it was distinctly held by the court, that if the contract in that case had been a guarantee, it would certainly have been the duty of the plaintiff, to have given immediate notice to the defendant of the extent of his engagement. And the same doctrine was asserted in the circuit court, in Cremer v. Higginson, already cited.[1]
Where there is a guarantee of advances or supplies, it is necessary, in the first instance, to make a demand of payment from the original debtor, or, at least, to use reasonable diligence in endeavoring to make such demand, and notice of non-payment must be given in a reasonable time to the guarantor. This may be collected as the general result of the cases on this subject. But where an agent, in England, for merchants, the vendors of goods, in Russia, who guaranties "that the shipments shall be in conformity with the revenue laws of Great Britain, so that no impediment shall arise upon the importation thereof, or that, in default, the consequence shall rest with the sellers," it was held, that the agent made himself personally responsible to the vendee, and that in a declaration upon such a guarantee, against the agent, it is unnecessary to allege any application for indemnity to the principals. Readhead v. Cator, 1 Stark. 14. And it is not necessary to sue the debtor, before the right attaches to sue on the guarantee. Bank of New York v. Livingston, 2 Johns. Cas. 409. And where the guarantee is of a note or bill, payable at a future time, although it is not necessary to pursue the same strictness, in order to charge a guarantor, as to charge the drawer; yet a due demand and notice of non-payment ought to be given to the drawer and guarantor; and if the necessary steps are not taken to obtain payment from the parties who are liable on the bill, and solvent, the guarantor is discharged. Phillips v. Astling, 2 Taunt. 206; Warrington v. Furber, 8 East 245. But it is a sufficient excuse for not making a demand, that the debtor cannot be found, or that he is insolvent. Warrington v. Furber, 8 East 245; Phillips v. Astling, 2 Taunt. 206. And if there be gross laches in *155] securing the debt (Duval v. Trask, 13 Mass. 154; People v. Jansen, *7 Johns. 332; Hunt v. United States, 1 Gallis. 34); or if the creditor undertake to do anything whereby to lessen or postpone the responsibility of the debtor (Commissioners of Berks v. Ross, 3 Binn. 520); or if the right of the parties be altered, as, if any new debt have been incurred; or if the demand have been enlarged, to the prejudice of the guarantor (Peel v. Tatlock, 1 Bos. & Pul. 419; King v. Baldwin, 2 Johns. Ch. 554; Boultbee v. Stubbs, 18 Ves. 20); or if the creditor give time to his debtor, without the knowledge of the guarantor (Skip v. Huey, 3 Atk. 91; 6 Ves. 809, note a; Rees v Berrington, 2 Ves. jr. 540; Nisbet v. Smith, 2 Bro. C.C. 579; Moore v. Bowmaker, 6 Taunt. 379; s.c. 2 Marsh. 81); or if, upon a guarantee of a partnership debt, the partnership debt is discharged, by carrying the proportions of each partner to his separate account, without any notice to the guarantor (Cremer v. Higginson, 1 Mason 323); or if there be a fraudulent concealment, to the injury of the guarantor (Oxley v. Young, 2 H. Bl. 613, semble, EYRE, C.J.); in all these cases, the guarantor is discharged. And it has been held, in a recent case, that if the holder of a note is requested by the surety (being one of the joint-makers), to proceed without delay, and collect the money of the principal, who is solvent, and he omits to do it, until the principal becomes insolvent, the surety will be exonerated at law. (Paine v. Packard, 13 Johns. 174.) But this decision has been questioned by very high authority. (King v. Baldwin, 2 Johns. Ch. 563, 564.) Where there are several debts due, some of which are guarantied and some not, and payments are made by one debtor, the same general rule applies in this, as in other cases, that where the debtor makes no application of any payment, the creditor may apply it to any account he pleases. (Kirby v. Duke of Marlborough, 2 M. & S. 18; Dawson v. Remnant, 6 Esp. 26; Field v. Holland, 6 Cranch 3; Hutchinson v. Bell, 1 Taunt. 558; Sturgis v. Robbins, 7 Mass. 301.)
Pothier, in his Treatise on Obligations, has discussed with great learning and ingenuity, the whole doctrine of suretyship and guarantee. Traité des *Obligations, [*156 part 2, ch. 6, § 1 to 8. Among other things, he remarks, that care should be taken not to take for a promise to become surety, what one says or writes, unless there be a well-marked intention to do so. Therefore, he adds, if I wrote or said to you, that a man who asked you to lend him money, was solvent, this could not be taken for an agreement to become a surety, for I might well have no other intention than to inform you of what I believed to be the case, and not to bind myself. On this principle, it was adjudged, in a case reported in Papon, X. 4, 12, that these words in a letter to the keeper of a boarding-house, "A.B. intends to send his son to board with you; he is an honest man, and will pay you well," did not include an obligation. On the same principle, if I accompany a person to a woollen-draper's, where he buys cloth, the draper ought not to conclude, that I am security for him. The following distinctions and principles stated by this learned writer, seem worthy of notice, in reference to the subject of this note. 1. Where the surety has expressed the sum and cause for which he became surety, his obligation does not extend beyond the sum and cause expressed. As, if one become bound for the principal debt, he will not be liable for interest. 2. On the other hand, when the words of the suretyship are general and indeterminate, the surety is presumed to have bound himself for all the obligations of the debtor, resulting from the contract to which he acceded; and therefore, a surety, in general terms, is bound not only for the principal sum, but for interest; and not only for the interest due ex rei natura, but for that occasioned by the delay of the debtor. And this is conformable to the doctrine of the Roman law. 3. And in general, however unlimited the suretyship may be, it does not extend to the penalties to which the debtor may be condemned officio judicis propter suam contumaciam. 4. The obligation of suretyship is extinguished, by an extinction of the principal debt; by the creditor's disabling himself, by his own act, from ceding his action against his principal debtor, which the surety has an interest in having assigned to him; by the creditor's accepting in payment property, the title to which afterwards proves to be invalid, at least, if the principal debtor in *the meantime becomes insolvent. 5. And the principal debt may [*157 be extinguished, not only by payment, or a set-off, or release, but also by a novation of the debt, that is, by accepting a new obligation in discharge of the old one. 6. Pothier then puts the case, whether the surety be discharged, by the creditor's granting to the debtor a delay for the payment, and agrees with Vinnius, in holding the negative, for he says, the simple delay, not making the debt appear discharged, deprives the surety of no means of providing for his own safety, and the surety cannot pretend, that the delay prejudices him, since he himself derives an advantage from it. 7. According to the principles of the ancient civil law, the creditor could demand payment from the surety, without first resorting for payment to the principal debtor. But Justinian altered that rule, and gave to the surety an exception or plea, which is called an exception of discussion, or of order, by which he may require the creditor to proceed, in the first instance, against the principal debtor. And this rule, with some exceptions, was adopted into the ancient jurisprudence of France. But at no time, either in the civil or French law, did the bringing of a suit by the creditor, against his principal debtor, discharge the surety, who, therefore, remained bound, until payment. And the omission of the creditor to institute a suit of discussion, against the principal debtor, notwithstanding a request of the surety, until after the debtor becomes insolvent, is not thought to discharge the surety. But if a surety had contracted only to pay what the creditor could not obtain from the principal debtor, an omission to sue, for a long time, and until after an insolvency, may discharge the surety. 8. To entitle the surety, after payment, to recover over against the principal debtor, it is necessary, that the surety should not have neglected, by his own fault, to plead any proper plea in bar of the creditor; that the payment should have been valid, and should have discharged the principal debtor; and that the principal debtor should not have paid a second time, by the fault of the surety. See Pothier, Traité des Obligations, part 2, ch. 6, § 1 to 8. The Code Napoléon, or civil code, adopts, for the most *158] part, the *doctrines stated in Pothier. Liv. 3, tit. 14, art. 2011 to 2043. It declares, that a guarantee or suretyship (cautionnement) ought not to be presumed; it ought to be express; and ought not to be extended beyond the limits of the contract itself. An indefinite guarantee of a principal obligation extends to all the accessories of the debt. The guarantor is not bound to pay, but upon the default of the debtor, who ought, in the first instance, to be sued by discussion, against his goods. In a suit against the guarantor, he may enter the same exceptions to the debt (except they are purely personal) as the principal debtor may. The surety is discharged, when, by the act of the creditor, the guarantor cannot have the benefit of a substitution to the rights, hypothecation and privileges of the creditor. A simple postponement of the time, granted by the creditor to the debtor, does not discharge the guarantor, who may, however, in that case, pursue the debtor to enforce payment. Code Napoléon, ubi supra.
See also, the Digest of the Civil Laws of Louisiana, p. 429. Erskine's Institutes of the Laws of Scotland, 10th ed., 326. The coincidences between the doctrines of the common law, and those of the civil law, and the codes derived from it, are very striking; and the differences in particular cases, seem to result rather from the difference of the remedies of guarantors and sureties, under the various systems (which, of course, require a corresponding change as to their liability), than from any theoretical opposition in principles.
[1 Aldricks v Higgins, 16 S. & R. 212; Anderson v. Blakely, 2 W. & S. 237.]
[1 Kellogg v. Stockton, 29 Penn. St. 460.]