ETTA WOODS, Administratrix, et al., Appellants, v. CHARLES BRAND, Appellee.

**REFORMATION OF INSTRUMENTS: Mutual Mistake.** Reformation will be granted when it is made to appear that the parties, through *mutual oversight*, failed to state in the contract that the grantor was not selling the mineral rights underlying the land in question.

*Appeal from Polk District Court.*—JOSEPH E. MEYER, Judge.

DECEMBER 12, 1919.

ACTION to reform a written instrument to convey land. Plaintiff's petition was dismissed. Plaintiff appeals.—*Reversed.*

*J. L. Gillespie,* for appellants.

*Mulvaney & Mulvaney* and *Geo. J. Thomassen,* for appellee.

GAYNOR, J.—This action was brought by one J. L. Woods and wife, Etta Woods, to reform a certain writing, intended to evidence a certain agreement to convey land. Shortly after the trial was had, J. L. Woods died, and his administratrix was substituted plaintiff.

The record shows that, on or about the 16th day of July, 1917, J. L. Woods and his wife entered into an agreement, by which they undertook to sell to the defendant herein, Brand, for the agreed price of $2,450, the west 10 acres of the southeast quarter of the southeast quarter of Section 23, Township 80, Range 24, more fully described as "the west ten acres of thirty-three acres now owned by J. L. Woods." Subsequently, one Charles Howard undertook to reduce the agreement to writing. It was then signed by J. L. Woods and his wife, and later signed by defendant, Brand. The writing contained, among others, the following provisions:

"The party of the first part [meaning Woods] agrees to sell to the party of the second part [Brand] all his right, title and interest in and to the real estate hereinbefore described, for the sum of $2,450. The party of the second part [Brand] agrees to purchase all Woods' right, title and interest in and to said real estate, and to pay therefor the sum aforesaid; $500 to be paid on the execution of the contract; $1,950 on or before March 1, 1918."

The writing contained the further provision that, upon the payment of the sums aforesaid by Brand, Woods would execute and deliver to Brand a warranty deed and an abstract continued up to date.

It appears that, at that time, Woods did not own the mineral and coal rights; that this had been reserved in the

deed, and this deed was of record. It is the claim of the plaintiff that the failure to except the mineral and coal rights from the writing was due to mutual mistake and oversight in the preparation of the writing; that the under-standing and agreement between the plaintiff and the agent of the defendant, Howard, who acted for the defendant in the transaction, were that the plaintiffs did not undertake and agree to convey more than they owned, and that it was the thought that the mineral rights were not to be con-veyed to Brand; that the plaintiffs were only selling to the defendant the interests they had in the property conveyed.

This action is brought to reform the writing, so as to make it express the contract as it was understood and agreed to between plaintiffs and the defendant's agent at the time.

It not only appears in the conveyance under which Woods held the title that the mineral right was reserved, but it also appears that, after Woods obtained the title, he mortgaged the land, and these mortgages were made sub-ject to the mineral rights reserved. It appears that Woods and Brand were neighbors; that, for some time prior to the making of this conveyance, Brand, as the record says, "had his eye on Woods' land," and desired to purchase it, and had often spoken to people, saying that, if they could help him to buy some of the Woods' land, he would appre-ciate it. Brand and Woods were not on friendly terms. Just prior to this transaction, Brand met one Charles How-ard, an auctioneer living in the same little town of Ankeny, and talked to Howard about buying some of the Woods' land; asked Howard to assist him in buying 10 acres, and requested that he keep Brand's identity from Woods. Prior to this, neither Brand nor Howard talked to Woods about buying this land, nor had Woods ever said anything to Howard, touching the sale of the land. Woods had placed a sign on the fence, notifying the public that the land was

for sale. This sign was seen by Howard, and, we take it, by Brand too. Howard did not talk with Woods until after his talk with Brand. Without setting out the evidence, we are satisfied from the record that Howard was Brand's agent, and acting for him in the transaction, and that some arrangement was entered into between Howard and Brand by which Howard was to represent Brand in an effort to purchase from Woods the land in controversy. Brand told Woods he would pay $250 an acre for the 10 acres. Woods, at that time, had 33 acres. It was not then determined what 10 acres Woods would sell. Brand wanted 10 acres, however, nearest his home, and communicated this fact to Howard; so the contract was made to cover the 10 acres nearest the Brand home. Brand told Howard he would pay $250 an acre. When Howard first talked with the Woods, Woods wanted from $260 to $265 an acre. Howard told him, however, that, inasmuch as they were not conveying the mineral rights, inasmuch as they did not own the mineral rights, the price was too high. After some talk with Woods, he induced him to take $2,450 for the ten acres. In the contract, Brand agreed to pay the plaintiffs $2,450, and gave Howard a check for $50, which was subsequently canceled, and a check for $45 taken by Howard, in lieu of the $50 check. It appears that Brand, in discussing the price, said to Howard that $250 an acre was enough, because he was not getting the mineral rights. This record discloses, without any question in our minds, that both Brand and Howard knew, at the time they were making the purchase from Woods, that Woods did not own the mineral rights, and it was not the intention of Woods to convey more than he owned, and it was not the thought of either Brand or Howard that they were getting the mineral rights, at the time the contract was entered into. We take it that it was a mere oversight on the part of

Woods and Howard that this reservation was not embodied in the writing.

The record discloses that, at the time this writing was made, Woods was a very sick man; had been sick about a year; was in the last stages of a fatal malady; that the sickness affected, not only his body, but his mind and memory; that he could not, at that time, see to read at all.

As said before, Woods and Brand were neighbors in the little town of Ankeny. It was a matter of common knowledge in that vicinity that Woods did not own the mineral rights. Brand testified:

"Howard asked me, after I discovered that Woods did not own the mineral rights, if I would admit that I had not heard rumors that Woods could not sell the minerals, and I said, 'Well, I will admit that there was a rumor, but I didn't know the nature of the rumor.' I didn't know what it was until now. The only rumor I ever heard was that Woods couldn't sell the land. Of course I didn't know,— I just heard them say something like that."

He further testified:

"The only talk I ever had with Mr. Woods was one day about January 25, 1918. Woods called me up, and said there was a mistake in the contract, an oversight, and I said I couldn't help it, and I asked him if Mr. Howard didn't read the contract to him, and he said, 'Yes,' and I said, 'That is the law.' He said he couldn't deliver the land, and I told him to do the next best thing."

It appears that, when the abstract was brought down to date and delivered to Brand's banker, it showed that Woods did not own the mineral rights. Brand was called in, and asked if his contract reserved the mineral rights. He replied that he didn't know; that he would go and get the contract. He got the contract, and brought it to his banker, and it was read over by the banker. The banker testified that Brand did not seem surprised when the con-

tract showed that Woods did not own the mineral rights. The banker then told him that Woods could not convey the mineral rights. Brand went to see an attorney, and subsequently advised the banker that the attorney had advised him to follow the contract. The banker testified:

"When I told him that the abstract showed that Woods did not own the mineral rights, the impression I got from looking at him was that he knew it before."

The record convinces us of two facts: That, in this whole transaction, Howard represented Brand, and was his agent; that Howard knew, at the time the contract was made, that Woods did not own the mineral rights; that, when he made the purchase for Brand, he knew that Brand was not getting the mineral rights; that the proposition upon which the minds met was the sale of the land without the mineral rights. We are satisfied further that, when Brand signed the contract, he understood he was not getting the mineral rights, and that he is now seeking to enforce the letter of the contract against the real intention of the parties. Brand is now claiming of Woods $1,000 damages, because of Woods' inability to convey to him the mineral rights. He has a suit pending to that effect at this time. We are satisfied that he neither intended nor understood that, in the purchase, Brand was getting more than Woods had. It will be noted that the first part of the contract provides that Woods would sell to defendant all his right, title, and interest. Of course, Woods agreed to make a warranty deed. This serves as a basis for defendant's contention.

Upon this whole record, we are satisfied that plaintiff did not intend to convey the mineral rights, for he did not own the mineral rights; that the defendant knew, at the time he purchased it, that plaintiff did not intend to convey the mineral rights, and that he did not own them, and could not convey them; that it was due to plaintiff's physical

condition, operating upon his mind, and the haste with which the writing was prepared, that the reservation was omitted. Surely, the contract, independent of the writing, must be recognized by a court of equity. The writing is intended only to express the contract. If, by oversight or inadvertence or forgetfulness on the part of both, it does not express the real contract, equity will reform it so that the writing may express the proposition upon which the minds of both parties met, and that was that plaintiff was not selling, and the defendant was not buying, the mineral rights.

We are aware of the rule which requires strict proof, to justify the reformation of a written instrument; but, applying these rules with all their strictness, the mind, in reading this whole record, reaches a conclusion that this writing does not express the proposition upon which the minds met; that the omission of this reservation was unintentional, inadvertent, and due to oversight. We go further, and say that the record satisfies us that, when Brand signed the writing, it was not with any thought in his mind that he was getting more than Woods was able to convey. He was not buying a lawsuit, nor did he believe he was buying a lawsuit. We go further, and say that, notwithstanding the denial of the defendant, he knew that Woods did not own, and did not intend to convey to him, the mineral rights. He is charged with the knowledge of his agent, who acted for him in the transaction, and we think the court erred in refusing to grant the plaintiff the relief prayed for, and its action is, therefore,—*Reversed*.

LADD, C. J., WEAVER and STEVENS, JJ., concur.