F. C. POSPISHIL, Appellant, v. HANS JENSEN et al., Appellees.

MAY 15, 1928.

*John D. Randall,* for appellant.

*Carl F. Jordan,* for appellees.

MORLING, J.—I. The court reformed the mortgage sued on by striking from it this clause:

"It is further expressly agreed that this mortgage shall stand as security for any other indebtedness the mortgagee may hold or acquire against the said mortgagor."

Defendants made a payment of $1,120 on October 16, 1922, which, except for $75, plaintiff applied upon a note not secured by the mortgage as reformed, and which defendants alleged was  to be applied upon the mortgage indebtedness. The court sustained defendants' claim to have this payment so applied. These are the controverted matters.

Owing to denials of abstract and amendment, we have had recourse to the transcript, from which the quotations will be made.

Plaintiff and defendant Hans seem to have been in partnership in the tire business. Plaintiff sold his interest to Hans for $4,000. Plaintiff testifies that, before they went to the bank to have the papers drawn, it was agreed that defendants were to give a mortgage for $2,500 on their home and a note for $1,500 besides. Plaintiff testifies:

"Q. When this mortgage was signed over there, did you read it over yourself, before you signed it, over in the bank,— the fine print? A. Well, I don't remember whether I did or not; I couldn't swear, one way or the other. Q. You left that to the banker to read it to you, didn't you, on account of your eyes? You told him what you wanted in it, and then you had him read it to you? A. Yes. * * * Q. Did you make them read you all the fine print before you accepted the mortgage, or did you just notice that the amounts were correct and the description of the property correct? A. Well, I think I was only concerned with the amounts that were on the mortgage."

Defendant Hans testifies that it was agreed that the mort-

gaged property "was to be good for the $2,500, and the other was not to be secured." He says he was not at the bank until after the papers were made. He testifies that it was the president, Burianek, who brought him the mortgage and note. From the testimony of the other witnesses it appears to have been Welch who drew it. Defendant Hans testifies:

"I started to read it, and it was kind of dark in there, so Mr. Burianek said he would read it for me. * * * He read on down all the big letters, and when he got down to the small, he said he couldn't see very good, and it didn't amount to anything, anyway, and he would skip that, and go on with the rest of it. And I took his word for it."

Defendant Frances says that she later went to the bank, to sign.

"They read it to me, and I begin to read it, and when I begin to read it, I was kind of slow in doing so, and he says to me, he says, 'Let me read it,—I am accustomed to reading this;' so I have not had a chance to read this mortgage through. * * * He [the banker] says to me, when he come to a certain part of the mortgage, 'I didn't read all of it,' they said, 'we will omit this,' they said; it didn't amount to anything, they said."

Plaintiff was not there then. Welch testifies, in substance, that he couldn't remember about its being read to defendant; that it was not the custom; that:

"Jensen planned and wanted to, if possible, liquidate the $1,500 note within three or six months, just as quick as he could get to it; and for that reason they wanted two separate notes, instead of one."

The evidence is that defendants did not know of the blanket clause until a short time before the trial. The mortgage is dated April 1, 1921. It recites a consideration of $2,500. The defeasance clause is that the mortgage is "to be void upon condition that either the said H. C. Jensen, Jr., or Frances Jensen shall pay or cause to be paid to the said F. C. Pospishil $2,500 according to the tenor of one promissory note therefor, dated April 1, 1921, * * * The note being for twenty-five hundred dollars, due three years after its date."

Plaintiff's propositions on this branch of the case are that fraud must be pleaded, and that, when no fraud or artifice is used by plaintiff, defendant cannot set up his own carelessness

to excuse him from reading the instrument. The undisputed agreement was that the mortgage should be given on defendants' home for $2,500. The banker was instructed to so draw it. Ostensibly it was so drawn, but on the bank's blank form, which contained among the conditions in fine print the blanket clause objected to. This clause was not agreed upon by or known to the parties. To give effect to it is to make for the parties a contract by which defendants mortgaged their homestead for $4,000, instead of $2,500, as agreed. Neither of the parties understood that such clause was in the mortgage. Plaintiff sold his stock on his agreement to take a mortgage for $2,500. He did not demand or expect a mortgage for $4,000. In his now demanding foreclosure for the $1,500, as well as for the $2,500, he asks the court to give him an unconscionable advantage of a mistake which was as much his as defendants'. Equity will not aid such endeavor. It does not matter that one or both failed to read the contract. On fundamental principles, the court will grant reformation for mutual mistake. *In re Estate of Patterson,* 199 Iowa 362; *Woods v. Brand,* 187 Iowa 1076; *Gjellefald v. Drainage Dist.,* 203 Iowa 1144; *Merriam v. Leeper,* 192 Iowa 587. The decision in *Turnis v. Ballou,* 201 Iowa 468, was specifically based upon the particular facts of that case, and is not applicable. This is true also of *Corn Belt Sav. Bank v. Kriz,* — Iowa — (rehearing denied December 14, 1928).

II. The other error argued is in finding that a payment of $1,022.99, October 16, 1922, should be applied on the mortgage note. The defendants gave a check for $1,022.99, and in addition they receipted for an account owed by plaintiff, making a total payment of $1,120. Plaintiff's propositions are that the burden was on defendants to show that they directed application on the $2,500 note; that in the absence of such direction plaintiff had the right to make the application, and to make it on the unsecured and past-due indebtedness. The question is one of fact. The court has examined the transcript. The testimony is too lengthy to set out extensively. When defendants bought out plaintiff's interest, they evidently had rosy expectations of soon paying the $1,500 from the business. Defendant Frances changed her occupation from housekeeper to bookkeeper, cashier, and collector. She got no wages. Their expectations soon van-

ished. Collections were difficult, and payments not easy to make. Defendants seem to have become impressed with the desire, if not necessity, of saving their home. Plaintiff acquired other notes against defendants. Defendants made some payments upon them, but they, like those in controversy, have gone to judgment. The plaintiff kept the notes and mortgage at the bank. The check in question was drawn there, and left with Welch, and signed by Hans, pursuant to conversations between defendants, and between defendants and plaintiff, which will be in a moment referred to. Plaintiff was not at the bank when the payment was made. He says merely:

"Q. Do you remember having any conversation with Mr. and Mrs. Jensen in which this $1,022.99 payment, marked defendants' Exhibit A, was mentioned? A. No, sir, I do not. * * * Q. Then you never consented that this payment, defendants' Exhibit A, should go on the mortgage? A. No, I did not."

This leaves the case, therefore, on the facts, to turn on the testimony of defendants and the banker. Defendant Hans testifies that, before leaving the check with Welch, he told plaintiff that he wanted to pay a thousand dollars and interest, and plaintiff told him to take it to the bank; that "he did not have the papers, to give me credit on."

"Q. What papers was he talking about? A. The mortgages. * * * Anyhow, that is what I had in my mind; I suppose he was thinking of the same. Q. Was the mortgage mentioned? A. I couldn't say; it was a long time ago."

He says his wife was there; that they [defendant and his wife] had talked about it two or three times, in that day and a half or two days. He testifies that he thought plaintiff was there when defendant and his wife spoke about the mortgage. On cross-examination, he says that, when he left the check at the bank, there was nothing said, because he had talked to plaintiff, and supposed plaintiff had given instructions; that plaintiff "said he would give me credit, and I took it for granted it was on the mortgage." On re-direct, Hans testifies that:

"I told him [plaintiff] I wanted to pay the money on the mortgage, and he said, 'All right.'"

Welch testifies:

"Q. And in regard to this thousand-dollar payment there, —do you remember whether or not any mention was made to you

about applying that on the mortgage note, rather than on the $1,500 note? A. No; there was not any mention made of that. If there had been, I would have either applied it on there, or, if my understanding was to the effect it didn't belong on there, I would have inquired, and ascertained from both parties, before I made any indorsement. * * * Whether Mr. Jensen paid it or Mrs. Jensen, or just who handed me the money, I can't say. * * * at the time one payment was made, Mr. Jensen brought me some, either money or checks, and a bill that he had against Mr. Pospishil for fixing some tires * * * and a few days before that, Mr. Pospishil had phoned me, to the effect that Mr. Jensen was coming over, to make a payment, and he would bring along a receipted bill. * * * and it's just the odd feature of it that makes me recall that. * * * I see by the indorsement of October 16, 1922, that the notes of Jensen was credited with a thousand payment on principal, 45 on one, and 75 on another, which would make $1,120. And the body of this check here is in my handwriting. The matter was brought to me, with that receipted bill, and I was told by Mr. Jensen how to credit the money; and here it was $1,022.99, instead of $1,120; and that was practically the same information I had been given by Mr. Pospishil, a few days in advance of Mr. Jensen, calling at the bank.''

We think that from Welch's entire testimony it is apparent that he was testifying from habits and course of business and indorsements, rather than from personal recollection. His testimony, as will be seen, is out of accord with the circumstances, and somewhat self-contradictory. The testimony of Hans is self-contradictory. This condition remits us to the testimony of Frances. She says that, before the payment was made, plaintiff ''wanted some money, and of course we had this money here, and I says to my husband, I says, 'You take this check, and go and give it to Frank [plaintiff],' and Frank says, 'You leave it over to the bank.' * * * That check was to be paid on the money we had borrowed on our home. Q. Did you tell Mr. Pospishil that? A. Yes. Q. And what did he say? A. He said, 'All right.' * * *''

She also testifies that, after the payment was made, she had a conversation with plaintiff about the payment, in which he

"said he got it, and gave us credit on it * * * on the mortgage note;" that her husband was present.

The evidence shows (and the circumstances corroborate it) that they intended the payment to go upon the mortgage on their home. The weight of the evidence is that they so told plaintiff. Plaintiff did not object to such application. The money was that of defendants. They had the right, before paying it to plaintiff, to prescribe the conditions as to application on which they would pay it, and on which plaintiff might have it; and plaintiff, by accepting it without protest, would be bound thereby. 21 Ruling Case Law 88; *Monidah Trust v. Hruze,* 62 Mont. 444 (205 Pac. 232). There is no claim, in evidence or argument, that plaintiff asserted a right to refuse payment before maturity. An interest payment had been in default since October 1st. The note provided that, on failure to pay interest for 30 days after due, the whole indebtedness should become due. The maker reserved the right to pay any of the principal on any interest pay day. The principal of the mortgage debt at the time of the payment was in danger of becoming due in two weeks, for default in payment of interest. There is no evidence, except the general statement of Welch above referred to, that defendants gave any direction for, or ever considered, such indorsements as were made, namely: "Interest payments * * * October 16, 1922, paid to 10-1-22 $75;" and on the $1,500 note, "Paid on principal 10-16-1922, $1,000, due on principal $500, endorsement on interest 10-16-1922, $45 to 10-1-1922." If defendant Hans had directed Welch to make the indorsements that were made, it is reasonable to suppose that they would have been made, and the check canceled, at the time. The check, however, while dated October 16th, was canceled October 17th. It is not improbable that, Jensen having left the check and account with Welch without instructions, Welch, after conferring with plaintiff, made the indorsements the next day, when the check was canceled. As said by Chief Justice Marshall, in *Tayloe v. Sandiford,* 7 Wheat. (U. S.) 13 (5 L. Ed. 384) (cited in *Barrett v. Sipp,* 50 Ind. App. 304 [98 N. E. 310]) :

"A person owing money under distinct contracts has undoubtedly a right to apply his payments to whichever debt he may choose; and, although prudence might suggest an express direction of the application of his payments at the time of their

being made, yet there may be cases in which this power would be completely exercised without any express direction given at the time. A direction may be evidenced by circumstances, as well as by words."

We see no reason to doubt the recollection of defendant Frances, and think her testimony should be, as it evidently was by the district court, who saw and heard the witness, accepted. The preponderance of the evidence is that the check for $1,022.99 was given pursuant to defendants' directions to plaintiff that the cash payment to be made to the bank should be applied on the mortgage indebtedness. The application to be made of the account apparently was not mentioned.

Plaintiff further argues the case on the theory that there was no express agreement as to the application (not that plaintiff would not consent to receive it before due), and that, in the absence of such an agreement, the law will apply the payment to the matured, rather than to the unmatured, and to the unsecured, rather than to the secured, debt, and cites *Cain v. Vogt,* 138 Iowa 631, 636. It was there said:

"Indeed, in the absence of an express agreement or an application by the debtor, the trend of authorities is to the effect that, as between two debts, one due, and one not due, the creditor has no choice, and the application must be upon the latter. * * * It should be said, before leaving this branch of the case, that the rules of law to which we have referred, while generally recognized and approved, are not without their exceptions, and that a court of equity will always feel at liberty to so control their application as to prevent manifest injustice to either party."

If we assume, with plaintiff, that the defendants have not shown a direction for application (plaintiff not protesting payment before maturity), we arrive at the same result. It is said in *First Nat. Bank v. Hollinsworth,* 78 Iowa 575, 578:

"If neither made the application, 'then the law applies it according to its own notions of justice.' *Whiting v. Eichelberger,* 16 Iowa 422. This rule has abundant support in authorities before cited, as well as many others."

See, also, *Cremer v. Higginson,* 1 Mason 323 (6 Fed. Cas. 797) (per Justice Story) ; 21 Ruling Case Law 97 ; 30 Cyc. 1240.

If we leave out of consideration (as we must, on the theory on which the case was tried below and here,) the right of the

creditor to refuse payment of an interest-bearing debt before maturity (the application of which to this case, if insisted upon, would be doubtful), and assume that no direction was given by defendants, the application on the matured debt, as observed in *Cain v. Vogt,* must be made by the creditor, because he has no choice. It must be presumed that the debtor intended (in the absence of other circumstances) to relieve himself from the debt which is due, and on which he is liable to immediate action. As observed in that case also, the rule is not without exceptions. In *First Nat. Bank v. Hollinsworth,* 78 Iowa 575, after referring to the rule that, "with slight modification," the rule of application by the court is to apply to the precarious, rather than to the secured, debt, we further said:

"The modification of the rule as claimed is that it is not arbitrary, but is to be applied only under equitable considerations applicable to particular cases. * * * This court, in consonance with the legislative purpose, has at all times adopted a liberal construction of the law for the preservation of the homesteads of debtors, both from considerations of individual and public good. The spirit of our homestead law goes further than to subserve the design or purpose of the debtor and owner of the homestead. It looks to the protection of the family of which the debtor is the head, and will not allow him, except by the concurrence of his wife, to make a valid pledge or disposition of it. The law undertakes to guard it for the family. It is certainly the spirit and purpose of the law to guard it against indebtedness, except for debts contracted before its purchase; and if it may be said that both the creditor and the debtor have had the opportunity, in this case, to make the application, and each has failed, will not the law, in applying the equitable rule, look beyond the act of the debtor, and save to the family its home? It is to be kept in mind that the wife is a party against whom this relief is sought, and has in no manner relinquished her homestead privilege. In view of the authorities cited, and of our own laws on the subject of homestead protection, we think the application of the payments should be such as to preserve the homestead right."

In *Shaffer Bros. v. Chernyk,* 130 Iowa 686, it is said:

"That the payment in property should be so applied by the court as to protect and preserve the homestead is well settled."

In *Briggs v. Iowa Sav. Loan Assn.,* 114 Iowa 232, 234, it is said:

"The payments made by Briggs were on his [building and loan] stock. He suggested no application of them on either loan, and the creditor made none. Under these circumstances, the money should now be applied first upon the debt against the homestead."

The equitable application, therefore, would be in accordance with that which defendants claim was directed.—*Affirmed.*

STEVENS, C. J., and FAVILLE, DE GRAFF, and ALBERT, JJ., concur.