## HERMAN HOLDEN v. FARWELL, OZMUN, KIRK & COMPANY.[1]

May 16, 1947.

No. 34,282.

[1]Reported in 27 N. W. (2d) 641.

*Paul C. Thomas,* for appellant.

*William R. Mitchell,* for respondent.

MATSON, JUSTICE.

Defendant appeals from an order denying its motion for a new trial.

Plaintiff, as administrator of the estate of Carl R. Holden, deceased, brought this action against defendant to obtain the satisfaction or cancellation of a mortgage given by decedent and his wife, Anna Holden, as mortgagors. Decedent, prior to his death on November 19, 1942, had for many years operated a retail hardware store at Garvin, Minnesota, as a member of a partnership known as Holden & Hughes, which partnership is hereinafter referred to as the firm. Since 1927, the firm had bought merchandise on credit from defendant, a wholesaler in hardware. As of November 1, 1933, it was indebted to defendant on open account in the sum of $2,556.82, and in liquidation of this account the firm issued two postdated checks for the respective sums of $198.06 and $200 and a demand note for $758.76, with the balance of $1,400 covered by a note in that sum executed by decedent and his wife and secured by a mortgage given by them on their homestead. This mortgage note dated November 8, 1933, was payable in installments beginning with January 20, 1934, and ending with September 20, 1934.

After the execution of the demand note by the firm and the execution of the mortgage note by decedent and his wife, the firm con-

tinued as before to buy on credit from defendant. Defendant kept two sets of records, one for its open credit account and one for its note payments. At decedent's death, it is conceded that the firm was indebted to defendant in a considerable amount. On April 8, 1943, defendant filed an itemized claim against decedent's estate, and this claim included, in addition to amounts otherwise due from the firm, an item of $1,108.06 alleged to be due on a note secured by the above-mentioned mortgage. On February 4, 1944, while said claim was still pending in the probate court of Lyon county, defendant proceeded to foreclose said mortgage by advertisement, and by its notice of foreclosure claimed $1,000 due as principal and $125 due as interest to December 31, 1941. Prior to the foreclosure sale, plaintiff and defendant entered into a stipulation whereby it was agreed that if plaintiff should bring an action to set aside the foreclosure proceedings on the ground that the original $1,400 mortgage indebtedness had been paid in full and plaintiff should prevail in such action, the trial court should order defendant to satisfy the mortgage and give plaintiff a quitclaim deed conveying any interest which defendant might have acquired as a result of the foreclosure. After the foreclosure sale was held, plaintiff brought this action to have the mortgage satisfied or canceled. The trial court found that the entire mortgage indebtedness had in fact been paid prior to decedent's death, declared the foreclosure proceedings to be void, and ordered defendant to satisfy the mortgage and give a quitclaim deed as stipulated. Defendant's blended motion for amended findings or a new trial was denied, and it appeals.

On or about August 29, 1934, defendant's traveling collector, Henry Dearborn, who died prior to the trial below, called on decedent at Garvin in regard to the indebtedness. Present and participating in the conference between Dearborn and decedent was Marvin Holden, decedent's son, who had been steadily employed by the firm from 1923 to the time of decedent's death. Prior to this conference with Dearborn, the firm had issued the following checks payable to defendant:

| Check No. | Dated | Amount | Check Stub Notation | How Applied by Deft. |
|-----------|-------|--------|---------------------|----------------------|
| 1449 | 1/20/34 | $125 | Note inst. & int. | Mortgage note |
| 1473 | 2/27/34 | $125 | Note and int. | Mortgage note |
| 1758 | 3/27/34 | $150 | Note and int. | Mortgage note |

(In addition to amounts above shown, each of the foregoing three checks included the respective sums of $1.50, $2.17, and $3.30 as interest.)

| Check No. | Dated | Amount | Check Stub Notation | How Applied by Deft. |
|-----------|-------|--------|---------------------|----------------------|
| 1788 | 4/30/34 | $75 | One-half note ins (tallment) | Demand note |

(Defendant's records show an erasure indicating that the above check was originally applied on the mortgage note and that the original entry was later altered to apply payment on the demand note.)

| Check No. | Dated | Amount | Check Stub Notation | How Applied by Deft. |
|-----------|-------|--------|---------------------|----------------------|
| 1807 | 5/24/34 | $75 | On account | On account |
| 1863 | 7/28/34 | $75 | On account | On account |
| 1868 | 8/ 7/34 | $75 | On account | On account |

At and as a result of the conference with Dearborn, the following postdated checks were issued:

| Check No. | Dated | Amount | Check Stub Notation | How Applied by Deft. |
|-----------|-------|--------|---------------------|----------------------|
| 1891 | 8/30/34 | $75 | On account | On account |
| 1892 | 9/10/34 | $60 | On account | On account |
| 1893 | 9/20/34 | $60 | On account | On account |
| 1894 | 9/29/34 | $68.54 | On account | On account |
| 1895 | 10/10/34 | $75 | On note | Demand note |
| 1896 | 10/20/34 | $75 | On note | Demand note |
| 1897 | 10/30/34 | $75 | On note | Demand note |
| 1898 | 11/10/34 | $75 | On note | Demand note |
| 1899 | 11/20/34 | $75 | On note | Demand note |
| 1900 | 11/30/34 | $75 | On note | Demand note |
| 1901 | 12/10/34 | $75 | On note | Demand note |
| 1902 | 12/20/34 | $75 | On note | Demand note |
| 1903 | 12/29/34 | $83.76 | On note | Demand note |

It is admitted that the first three checks above listed, in the sum total of $400, were properly applied in reduction of the mortgage indebtedness. On January 2, 1935, a new note, No. 5330, for $1,131.53

(inclusive of $1,000 principal and $131.53 interest), executed by the firm but not by decedent's wife, was delivered to defendant, and on January 25 the original $1,400 note, No. 4843, was returned to the firm. On the same date, the original demand note, No. 4865, for $758.76 was actually marked "paid" and likewise returned to the firm. Unlike note No. 4843, which bore six percent interest, note No. 5330 specified seven percent interest and obviously included ac-. crued interest in excess of any amount which could have been due on the mortgage indebtedness. Note No. 5330 was in turn renewed on January 2, 1936, by note No. 5717 for $1,035.57, and this latter sum included accrued interest on all the indebtedness of the firm to defendant. Note No. 5717 was renewed on January 2, 1937, by note No. 6047 for $1,108.06, which included as usual all accrued interest on all indebtedness. Although note No. 5717 was not returned to the firm, the following words were nevertheless stamped across its face: "Settled by renewals dated 1-2-37. Farwell, Ozmun, Kirk & Co. Per [signature]." Note No. 6047 was replaced on February 6, 1939, by note No. 6496 for $2,300, and in this latter note all indebtedness of the firm both as to principal and interest was included. None of the renewal notes were signed by decedent's wife, and there is no evidence indicating whether she knew of or consented to their execution.

■■■ The evidence falls far short of establishing an implied or express agreement that any of the renewal notes were to constitute payment of the original mortgage indebtedness. The renewal of a note or mortgage does not necessarily, and under ordinary circumstances does not, discharge the obligation. Munson v. Bensel, 169 Minn. 434, 211 N. W. 838. Whether the renewal is payment is to be determined from the intention of the parties. First State Bank v. First State Bank, 165 Minn. 285, 206 N. W. 459. A note taken in renewal of a prior note secured by a mortgage is presumed to have been accepted as conditional payment only, and the burden is upon one who claims that it discharged and extinguished the original note to prove an express or implied agreement to that effect.[2] In the

2Geib v. Reynolds, 35 Minn. 331, 28 N. W. 923; Wiley v. Dean, 67 Minn. 62, 69 N. W. 629; State Bank v. Mutual Tel. Co. 123 Minn. 314, 143 N. W.

absence of an expressed or implied agreement that the renewal note shall constitute absolute payment, the mere acceptance of such renewal note, even though we have a written recitation that it is received in settlement or payment of a prior note or obligation, is only conditional payment and does not effect an absolute discharge of such prior obligation. Combination S. & I. Co. v. St. Paul City Ry. Co. 47 Minn. 207, 49 N. W. 744; Mikolas v. Val Blatz Brg. Co. 147 Minn. 230, 180 N. W. 109; Harry Graff, Inc. v. Abram, 167 Minn. 244, 208 N. W. 801.

The confines of an opinion do not permit a detailed review of the evidence. It is enough, however, to call attention to the fact that decedent on March 1, 1940, and again on April 18, 1942, furnished to defendant, over his personal signature, financial statements indicating that a part of the firm's indebtedness was secured by a mortgage on his homestead. We also have for the date of February 12, 1941, a financial statement prepared by Dearborn and signed for decedent by his son showing a mortgage still existing on the premises. Obviously, plaintiff has failed to sustain the burden of proof that the renewal notes constituted absolute payment of the mortgage indebtedness, and any finding to the contrary is manifestly and palpably contrary to the evidence as a whole.

Again, bearing in mind that the first three checks totaling $400 were properly applied on the mortgage note, we come to check No. 1788 for $75. The check stub bears the notation "1/2 note ins." Defendant's records reveal that this check was first credited to the original mortgage note, but that the credit entry was later erased and changed so as to apply the payment on the demand note instead. We have no evidence that decedent's intended application, as shown by the check stub, was ever made known to defendant, except the circumstantial evidence that the payment credit corresponded in amount to one-half the mortgage note installment and that the check was originally credited to such note. To the contrary, we have the circumstance of pattern, namely, that if this check had been in

912, Ann. Cas. 1915A, 1087; 4 Dunnell, Dig. & Supp. §§ 6254, 6255; 5 Dunnell, Dig. & Supp. § 7444.

fact applied to the demand note, the nine postdated checks last above listed would equal the balance then due on the demand note. Plaintiff himself, however, points to certain patterns of payment to indicate application on the mortgage note. Why and when defendant's bookkeeping records were altered we do not know. If either party is to have the privilege without explanation to alter its records, or if either party is permitted to select from a mass of payments such items as will suit its convenience in establishing a desired payment pattern, we are embarking upon a sea of uncertainty where we have no directional guide other than the conflicting desires of the litigants. The evidence at best is so unsatisfactory that it cannot be said that it indicates a seasonable and proper exercise by either the debtor or the creditor of the power to apply check No. 1788 to any certain note or debt, and therefore its application must be made by the court according to certain well-established principles of equity.

Checks Nos. 1807, 1863, and 1868 and postdated check No. 1891 were, by both parties, according to their respective, independent, and unaltered records, applied on open account and not on any note. There is evidence that the check-stub entries of the firm were accurately made in the usual course of business routine. We concede that a pattern of mortgage-note payment or of demand-note payment may be established by resorting to a selective guessing operation whereby certain items are selected and others disregarded according to the desires of the pattern builder, but such patternmaking, however skilfully done, has little, if any, probative value. In the light of the evidence, we see no justifiable basis for disregarding the clear and unmistakably expressed intention of the parties as established by the concurrence of their respective and independent bookkeeping entries. If we do so, what basis is there for not including checks Nos. 1892, 1893, and 1894, which both parties agree were properly credited on open account? Pattern of payment as an evidentiary element must be based on consistent facts and not on the vagaries of a yardstick of opportunistic convenience.

The stubs of the nine postdated checks numbered 1895 to 1903, both numbers inclusive, all bear the notation "On note" without in-

dicating whether the mortgage or the demand note was meant. In connection with check No. 1788, we have already pointed out the manner in which defendant's records show an erasure and a change in credit entry from the mortgage note to the demand note. In the same column beneath this entry which was so erased and altered, we have a ditto mark for each of said nine checks. We do not know whether these ditto marks were entered before or after the alteration in the credit entry for check No. 1788. It is true that the first ditto mark has been written over with the number of the demand note, but this only serves to emphasize that defendant's records have been changed and to cast doubt upon their probative value. The reason for holding the evidence unsatisfactory as to the application of check No. 1788 applies also to these nine postdated checks, and their application must therefore be left to the court as if both parties had wholly failed to exercise any power to designate how the payments should be applied.

■ We are then faced with the issue as to the application that should be made of the payments represented by check No. 1788 and checks numbered 1895 to 1903. Where the parties have failed to exercise effectively their power of making a specific application of the payments, the duty devolves upon the courts to make such application according to the principles of equity and justice. Hersey v. Bennett, 28 Minn. 86, 9 N. W. 590, 41 Am. R. 271; Massachusetts Mut. L. Ins. Co. v. Paust, 212 Minn. 56, 2 N. W. (2d) 410, 139 A. L. R. 473. The practical application of these principles of equity is governed by certain general and well-established rules. In the instant case, defendant seeks to have the payments applied on a demand note that is unsecured, whereas plaintiff would have them credited to a note secured by a mortgage on decedent's homestead. Where a homestead security is not involved, it is clear that we follow the majority rule that, in the absence of a specific appropriation of payments by the parties, the court will apply them to the unsecured or least secured debts in preference to those secured or more adequately secured. Gardner v. Leck, 52 Minn. 522, 54 N. W. 746; Thorne v. Allen, 72 Minn. 461, 75 N. W. 706; 5 Dunnell, Dig. & Supp. § 7458;

Annotation, 97 A. L. R. 347. The preference accorded to an unsecured debt over one that is secured must give way, however, to the superior equities of a third person who, with respect to a secured debt that has matured, stands in a position of, or similar to that of, a surety or guarantor. Restatement, Contracts, § 394, provides:

"(1) Where neither the debtor nor the creditor seasonably exercises his power to apply a payment to one of several debts, the payment is applied to the earliest matured debt to which the creditor might have applied it, except that application is made to

"(a) *a matured debt which the debtor is under a duty to a third person immediately to pay, rather than to one where he is under no such duty; or*

"(b) if he is under no such duty,

\* \* \* \* \*

"(ii) to an unsecured or precarious matured debt rather than to one that is secured or certain of payment." (Italics supplied.)

■ Do we have here, by virtue of the fact that a homestead is involved, equities that are equivalent to those of a third person who, with respect to a secured debt that has matured, stands in the position of a surety or guarantor to whom the debtor owes a duty of effecting immediate payment? Decedent's wife voluntarily signed the mortgage and mortgage note and thereby gave her consent to the creation of a security right in the homestead. When the original mortgage note matured without being fully paid, she did not join in the execution of any renewal note, and there is no evidence that she ever consented thereto. In order to insure a stable and independent citizenry and thereby promote the public welfare, it has always been the policy of the law to protect with jealous zeal the homestead right of the citizen and his wife and minor children. This right is based on the fundamental conception that the home should be a citadel of security against the misfortunes and uncertainties of life. 3 Dunnell, Dig. & Supp. § 4193. Our statutes (see, Minn. St. 1945, §§ 507.02, 507.03, 507.04, 510.01 to 510.09, 525.145, 525.39, and 525.63[3]) have

---

[3]See, M. S. A. §§ 507.02, 507.03, 507.04, 510.01 to 510.09, 525.145, 525.39,

been carefully designed to effectuate this policy and to preserve the homestead to the family even at the sacrifice of just demands. Tomlinson v. Kandiyohi County Bank, 162 Minn. 230, 202 N. W. 494.

"* * * The homestead right is favored in the law, and when it is made security for debt by the signature and consent of the wife, it is favored even more than a surety or the security given by a third person. * * * This makes the analogy between the wife whose consent or signature is essential to the validity of such a security and a common surety very close, and indeed she is more highly favored and preferred. The creditor cannot exact or compel such a security, and the husband cannot give it, and it is by the free and voluntary act of the wife alone this right, so protected in the law, can become subject to the payment of debts." Dunn v. Buckley, 56 Wis. 190, 192, 14 N. W. 67, 68.

In Shaffer Bros. v. Chernyk, 130 Iowa 686, 687, 107 N. W. 801, certain property was conveyed in payment of a judgment, which included, among various items of indebtedness, an item secured by a lien on the homestead, but the conveyance was made without directions as to its application. The court held: "That the payment in property should be so applied by the Court as to protect and preserve the homestead is well settled." See, First Nat. Bank v. Hollinsworth, 78 Iowa 575, 43 N. W. 536, 6 L. R. A. 92; Briggs v. Iowa S. & L. Assn. 114 Iowa 232, 86 N. W. 320; Pospishil v. Jensen, 205 Iowa 1360, 219 N. W. 507; Annotation, 97 A. L. R. 354.

Checks numbered 1788 and 1895 to 1902, both numbers inclusive, each for $75, and also check No. 1903 for $83.76, in addition to the first three payments totaling $400, are therefore to be applied to the mortgage note for a total principal credit thereon of $1,158.76. Such application of the payments is consistent with the financial statements made by decedent as of March 1, 1940, and April 18, 1942, wherein he indicated the continued existence of a mortgage on the homestead but did not specify the amount due thereon. The financial statement prepared by Dearborn on February 12, 1941, and signed

525.63, and cf. Mason St. 1927 and 1940 and 1944 Supps. §§ 8196, 8198, 8201, 8336 to 8344, 8992-27, 8992-94, 8992-146.

by decedent's son Marvin to indicate a mortgage of $1,500 is, with respect to the amount due, wholly inconsistent with the admitted facts, as well as with Marvin's testimony that it was his "understanding" that the mortgage note was paid in full. The uncertain and indefinite testimony of both Marvin Holden and Agnes Holden, at its best, is manifestly and palpably contrary to the evidence as a whole and can furnish no basis for a finding that the entire mortgage indebtedness was paid.

We have given no consideration to the effect of the commencement and trial of this action while a claim for the amount due on the mortgage was still pending in the probate court against decedent's estate. The issue was not litigated below and is therefore not before us for review on appeal. See, Hart v. Bell, 222 Minn. 69, 23 N. W. (2d) 375, 24 N. W. (2d) 41.

There is no need for a new trial. The order of the trial court is reversed and the case is remanded for the amendment of the findings and conclusions of law and the entry of judgment in accordance with this opinion.

Reversed and remanded with directions.